## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

DC International, Inc.                                      Civil Action No. 09-1196

versus                                                     Judge Tucker L. Melançon

Zurich-American Insurance Group                  Magistrate Judge C. Michael Hill


## MEMORANDUM RULING

Before the Court is the Second Motions For Summary Judgment By American Zurich Insurance Company[1] ("Zurich") [Rec. Doc. 45], an opposition to the motion filed by plaintiff, DC International, Inc. ("DC") [Rec. Doc. 48], Zurich's reply memorandum [Rec. Doc. 51] and a Supplemental Memorandum in Opposition filed by DC [Rec. Doc. 54]. For the reasons that follow, the motion will be denied.

## I. Background

This action involves a workers' compensation insurance policy issued by Zurich to DC ("the Policy"). *R. 1*. DC is a service company that provides trained and qualified personnel to domestic and worldwide customers, primarily oil companies, both on land and offshore. *R. 27, Exh. 1, Aff. Of Hebert.* DC represents that the company provides personnel for services that their customers do not perform themselves but need in order to support their operations, such as "logistics coordinators, health, safety and environmental compliance representatives and emergency medical technicians/paramedics." *Id.* In its Petition, DC characterizes itself as providing "low risk support services to the oil and gas industry," including "dispatching and logistical coordination, health, safety and environmental compliance inspections, shore based office functions." *R. 1-1, ¶ 5.*

---

[1] Zurich previously filed a Motion for Summary Judgment on March 25, 2010, *R. 24*. Zurich's reference to its "Second Motions for Summary Judgment" includes its initial motion which the Court denied as premature under Rule 56(f) on June 1, 2010, *R. 24; 42. See, infra.*

DC provides the following factual allegations which Zurich does not dispute. Louisiana Companies was the insurance broker and agent for DC in 2007 and at all times relevant to this lawsuit.  *Id. at ¶ 9; R. 27.*  During the fall of 2007, while DC was in the process of obtaining various types of insurance coverages, Zurich solicited DC's insurance business through Louisiana Companies.  *Id.*  Zurich indicated that it was considering offering a package of insurance coverages to DC, but before writing the coverage, Zurich desired to investigate whether DC was a "labor provider for oil and gas exploration activities."  *Id. at ¶ 10.*  Louisiana Companies informed DC that if Zurich determined it was a labor provider, as opposed to a service company engaged in low risk activities, Zurich would not be interested in providing insurance coverage to DC.  *Id.*  On October 10, 2007, DC was informed by Louisiana Companies that Zurich had completed its investigation and had decided to offer a package of insurance coverages to DC.  *Id. at ¶ 11.*  On October 14, 2007, Zurich issued and bound several categories of insurance coverage for DC, including commercial general liability, automobile liability, umbrella coverage and workers compensation, for agreed upon base premium rates.  *Id. at ¶ 12.*  The Zurich Workers Compensation and Employers Liability Policy, No. 9262817, the subject of this litigation, was issued to DC for the period October 14, 2007 through October 14, 2008 ("the Policy").  *R. 45.*

On or about October 23, 2007, DC  requested a meeting with Zurich to discuss Zurich's audit procedures.  *Id. at ¶ 13.*  At the December 17, 2007 meeting, Zurich mentioned  that it may not agree that DC should be classified as a "service company" rather than a "labor company" for its workers compensation coverage.  *Id.*  Zurich indicated it would review its position and make a final determination.  *Id.*  DC received a notice from Zurich on April 30, 2008,  stating that it intended to change DC's classification to a "labor

2.

company" of oil and gas drilling workers and the premium rates for its workers compensation policy would be increased, retroactively. *Id. at ¶ 14.* Zurich and Louisiana Companies presented DC with a document seeking its consent of the proposed retroactive changes. *Id. at ¶¶ 15, 16.* DC refused to consent to any retroactive changes and thereafter canceled all of its insurance policies with Zurich and ceased its relationship with Louisiana Companies. *Id.* On May 29, 2009, DC received a demand from Zurich for additional premiums for $351,437 based on Zurich's retroactive reclassification of DC's business activities. *Id. at ¶ 16.*

DC filed a petition in state court on June 9, 2009 against Zurich and Louisiana Companies alleging breach of the contractual and fiduciary relationship between DC and Zurich by Zurich's actions of retroactively increasing the premium that DC paid for its Policy. *Id.* Zurich removed plaintiff's Petition to this Court on grounds of diversity of citizenship, arguing that the only non-diverse defendant, Louisiana Companies, was improperly joined. *Id.* DC filed a motion to remand which the Court denied, holding that the Petition failed to state a cognizable cause of action against Louisiana Companies. *R. 17.* Zurich answered the Petition and asserted a counter claim on July 30, 2009 against DC, seeking recovery of unpaid premium in the amount of $351,437. *R. 5.*

On March 25, 2010, Zurich filed a motion for summary judgment moving the Court for dismissal of DC's Petition on the basis that the Policy was clear and unambiguous and provided Zurich the right to audit the Policy and to adjust the premium, as necessary, including the classification of DC's workers. *R. 24; 33.* On May 29, 2010 the Court denied Zurich's motion for summary judgment without prejudice holding that DC was entitled to conduct discovery related to Zurich's re-classification of DC "from a service company to a

3.

labor company, in accordance with Rule 56(f)"[2].  *R. 41; 42.*  Zurich filed the Second Motions for Summary Judgment at bar, referring and incorporating the pleadings, arguments and exhibits submitted with its initial Motions for Summary Judgment.  *R. 45.*

## II.  Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;  *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[3] *Id.* at 322-23.

Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine

---

[2] Under the 2010 Amendments to the Federal Rules of Civil Procedure, former Rule 56(f) became Rule 56(d), "When Facts Are Unavailable To The Nonmovant."  FRCP 56(d).

[3] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325.  To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

issue of material fact requiring a trial. *Celotex Corp.,* 477 U.S. at 324; Fed.R.Civ.Pro. 56(c). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144. 159 (1970); *Little,* 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson,* 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. Analysis

As provided in its initial motion for summary judgment, Zurich asserts that DC's Petition for breach of contract should be dismissed based on the plain language of the Policy, and its counter claim granted because the results of its calculation of additional premium due for the Policy is uncontested.   In particular, Zurich contends that the premium is an "estimate" and provides for an audit to determine the final premium amount. *R. 24, Exh. A, Policy.*  Part Five - Premium"  of the Policy provides in pertinent part:

B.   Classifications

5.

Item 4 of the information page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

***

D.    Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

E.    Final Premium

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classification and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

***

G.    Audit

You will let us examine and audit all you records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

*Id.* In addition to the contentions in its initial motion, Zurich's second motion also contends there are no material contested facts regarding the nature of the work actually performed by DC personnel and the correct classification under the rules and regulations of the National Counsel on Compensation Insurance ("NCCI") for purposes of calculating premiums for workers compensation coverage is as a "labor contractor."

6.

In its initial summary judgment motion, Zurich submitted the affidavit of its Premium Audit Specialist, Philip A. Scimemi, who stated that under the applicable rules of the NCCI, additional premium was due under the Policy as a result of the re-classification of employees and agents of DC, as follows: (1) workers that had been classified by DC as "'radio and television broadcasting personnel' were determined to be personnel engaged in dispatching and related work on onshore and offshore oil and gas facilities;" (2) workers that had been classified by DC as "'hospital or professional employees' were determined to be personnel engaged in safety and EMT operations on onshore and offshore oil and gas facilities;" and (3) workers that had been classified by DC as "'outside sales employees' were determined to be engaged in safety training and compliance operations on onshore and offshore oilfield facilities." *R. 33.* Zurich also submitted the affidavit of its Premium Audit Reviewer, Lynne Szollosy, who avers that Scimemi's reclassification resulted in an additional $351,437.00 being added to the Policy premium. *Id.* at Exh. 2.

In addition to reasserting the affidavits of Scimemi and Szollosy, in its second motion Zurich submits the September 28, 2010 affidavit and report of its expert, Edward J. Priz. *R. 45-1, 09/28/10 Aff. and Report Of Priz.* Priz opines that: (1) The classification code corrections sought by Zurich are accurate for the kinds of work actually performed by DC's workers; (2) The classification codes shown on the original Workers Compensation application submitted by DC to Zurich were incorrect and inaccurate for the kinds of work actually performed by DC's workers; (3) It was not improper for Zurich to make the classification and rate corrections made on the DC policy after that policy had begun; and, (4) Zurich went beyond the requirements of the policy language in attempting to reduce the financial impact of using the correct classifications for DC. *Id. at ¶ 7.*

7.

Priz further states in his report that the classifications on the DC application are "contrary to the fundamental principle of the NCCI classification system, which is designed to classify the overall business enterprise, not particular subsets of the work environment." *R. 45-1, Priz Report, FN 4, Basic Manual For Workers Compensation and Employers Liability Insurance, NCCI, p. R.2.* Priz explains,

> For example, a janitor at a tire manufacturing facility is not classified into a janitorial classification, although there is such a classification. Instead, such janitorial workers are classified into the tire manufacturing code.

*R. 45-1, Priz Report, p. 6.*

In support of his contention that DC is properly categorized as a "labor contractor" for purposes of workers compensation premiums, Priz states:

> DC has made much of the distinction between their being a 'service contractor' as opposed to being a 'labor contractor', but the fact remains that DC operates as a labor contractor for purposes of Workers Compensation insurance. That is, DC provides workers who labor at the business premises of another business entity. The distinctions made by DC about what constitutes a labor contractor versus a service contractor are not distinctions recognized under the Manual rules that govern Workers Compensation insurance. Under these Manual rules, when a company provides workers to another business entity, the company providing the workers is considered a labor contractor. And these Manual rules explicitly state that such workers are to be classified as if they were direct employees of the business enterprise where they are performing the work.

Priz cites the NCCI Basic Manual as follows:

> **F. Employee Leasing, Labor Contractors and Temporary Labor Services**
> (1) Workers assigned to clients must be classified the same as direct employees of the client performing the same or similar duties.
> (2) If the client has no direct employees performing the same or similar duties, leased employees are classified as if they were direct employees of the client entity.

*Id. at p. 5-6*, citing *NCCI Basic Manual*, p. R9.

DC asserts that the rules in the NCCI Basic Manual as well as excepts from Priz's own book, <u>Workers Compensation, A Field Guide For Employers, Secrets to Reducing</u>

8.

_Workers' Compensation Costs_, Edward Priz and Scott Priz, self-published, copyright 2010, by Advanced Insurance Management, LLC,[4] are contrary to Zurich's contention that DC's personnel are considered "contract laborers." *R. 48-5.* In particular, DC notes that under the NCCI Basic Manual's Rule cited above, "F. Employee Leasing, Labor Contractors and Temporary Labor Services," sentence (1) does not apply because DC's employees  do not supplement the workforce of clients engaged in oil and gas drilling operations; and, sentence (2) does not apply because DC's employees are not "leased employees" of an oil and gas drilling client. *Id.* DC further argues that the statements made by Priz in his Report do not rise to the level of "uncontested fact" because they are directly contradicted by Priz's publication in which he states that an employer should not be classified the same as another employer just because they are present at the same work site or engaged in the same overall enterprise. *R. 48-5.* DC asserts that the following examples found in Priz's book contradict his opinion that DC is a "labor contractor":  First, Priz describes how he lowered the premiums of his trucking company client by correctly classifying the mechanics performing repair work on the trucks based upon their actual duties rather than the more expensive classification of "trucking" because they were employees of a separate business, *Id. at pp. 105-106*; Second, Priz describes how he got a substantial reduction in premiums and a refund of $60,000 for a concrete contractor client by convincing the NCCI that the client's employees were carpenters because they did not mix the concrete. *Id. at p. 110.*

In further opposition to Zurich's motion DC maintains that the evidence establishes that before the Policy was issued, Zurich agreed as a condition of writing the Policy to honor

---

[4] Zurich opposes DC's submission of the Declaration of Timothy W. Basden authenticating the attached excerpts of Priz's book because the Declaration is not notarized. Rule 56(c)(1)(A) requires that summary judgment documents such as the book excerpts must be authenticated through an "affidavit or declaration." Accordingly, the excerpts have been properly introduced into evidence. Fed. R. Civ. Proc. 56(c).

the classification codes used by DC's previous insurers.  DC cites the deposition testimony of Todd Mulford, the Agent/Risk Manager employed by Louisiana Companies as well as the affidavit of DC's International Human Resource Manager, Paul Hebert.  Mulford testified that beginning in 2005, he met with Hebert to try to convince DC to switch its insurance business from the ICT Insurance Agency to Louisiana Companies.  *R. 48-1, 09/30/10 Depo. Of Mulford, pp. 47-55.*  At the time, DC was insured for workers' compensation liability by AIG.  *R. 27-1, Aff. Of Hebert; R. 27-1, AIG Policy.*  The AIG policy classified DC's employees based upon their actual duties: 1) logistic coordinators, 2) health, safety and environmental compliance representatives, and 3) emergency medical technician/paramedics. *R. 27-2.*  Hebert's affidavit confirms that DC "only provided dispatchers, emergency medical personnel and safety compliance officers, never providing drilling personnel such as roustabouts, roughnecks, drillers, etc."  *R. 27-1, ¶ 15.*  Mulford understood that DC did not want to change workers' compensation insurers unless it was assured that any new insurer would agree to honor the employee classification codes used by AIG and DC's previous insurers.  *R. 48-1, pp. 47-55.*

In the fall of 2007, Hebert agreed to change insurance agencies and Mulford began the process of reviewing DC's insurance coverage.  *Id.*  Mulford was concerned with determining the nature of DC's business operations so that he could correctly communicate that business to any potential insurer.  *Id.*  Sometime in September 2007, Zurich expressed an interest in writing DC's insurance policies.  *Id.*  DC submitted an application for coverage to Zurich and Mulford and his colleague, Mary Courville, met with Mona Smith, the Zurich underwriter assigned to the DC account.  *Id. at pp. 42-44, 64-65.*  Mulford testified that he and Courville made it clear to Smith that DC would not do business with Zurich unless Zurich agreed to keep the classification codes the same.  *Id. at pp 72-74.*  Mulford and Smith

10.

specifically discussed that DC was not a labor provider for drilling operations or a temporary labor service. In response to Smith's main concern as to whether DC was a labor contractor, Mulford explained that DC was a services contractor which only provided technical services such as dispatchers, emergency medical personnel and safety compliance officers and that DC's employees remained under strict supervision by DC. *Id. at. pp. 65-70.* Mulford stated as a result of their conversation, Smith was convinced DC was not a labor contractor. *Id.* He also stated that before the coverage was bound, Smith told Mulford and Courville she would write the DC coverage using the same classification codes as the AIG policy. *Id. at p. 71-86.* Mulford testified as follows:

> A.    ... When Mona gave me her word that she would write the coverage at the same class codes that AIG has written the coverage for and that they would not change and if they would then she would tell us, then I believed her.
>
> Q.    When did she tell you that?
>
> A.    Before the coverage was bound.

*Id. at pp. 71-72.*

Hebert testified that before the Policy was bound, on or around the 20th of September, 2007, he received a telephone call from a Zurich Risk Assessment employee who inquired about the services DC provided because Zurich was concerned DC was a "temp service." *R. 48-2, Depo. Of Hebert, pp. 133-145.* Thereafter, on or about October 10, 2007, he was advised by Mulford that Zurich was satisfied that DC was not a labor contractor but a service company and wanted to write DC's coverage. *Id. at p. 151.*

DC also argues in its opposition that Zurich's attempted re-classification of DC's employees was arbitrary because Zurich has no evidence that DC provides labor for drilling operations. *R. 48.* DC contends that the first indication that Zurich might attempt to

11.

reclassify DC's workers came in a meeting on or about December 6, 2007, between Hebert and Daryl Beavers, an auditor employed by Zurich. *R. 48-1 at p. 118-121; R. 48-2 at pp. 156-163.* The meeting was requested by DC to clarify the reporting necessary under an "MEL" policy. *Id.* During the meeting, Beavers suggested that DC was a labor contractor in the business of providing labor to oil and gas drilling operations. *R. 48-2 at pp. 162-166.* Despite Hebert's explanation of DC's business, Beavers stated that Zurich would make a decision only after its "thorough investigation" of DC's operations. *Id. at pp. 166-169; R. 48-3, 08/24/10 Depo. Of Beavers, pp. 35-36.* Following the meeting, Beavers sent an internal email to Smith asserting that DC was a labor provider engaged in providing labor to offshore drilling operations. *R. 48-3, pp. 45-46.* In his August 24, 2010 deposition, Beavers testified that his opinion regarding DC's business was not based upon any new information which was unknown to Zurich before the Policy was written, that he had not received or reviewed Zurich's due diligence investigation conducted by the loss-control department before the Policy was written, nor had he discussed DC's operations with Mona Smith, who wrote the Policy. *Id. at pp. 25-36.* He further stated that he looked at DC's website but he could not identify the basis of his assertion that DC was a labor contractor and did not know how DC's competitors in the market were classified and rated. *Id. at pp. 45-46,48, 51.*

On April 30, 2008, DC was advised that Zurich intended to change the classification codes of DC's workers; however, a final determination of the actual codes had not been made. Following his final audit on November 19, 2008, Zurich's premium auditor, Philip A. Scimemi, released a "Description of Operations" describing DC as "a labor-only contractor to the onshore and offshore oil & gas industry." *R. 33, p. 3.* In his deposition, Scimemi stated that he based his conclusions on three sources of information: (1) the opinion of Daryl Beavers; (2) a discussion with Paul Hebert; and (3) DC's website. *R.48-4, pp. 46-*

*47.* Scimemi further stated that he had no experience in auditing a company such as DC and that he was only familiar with "Manpower" and "Administaff," *Id. at p. 51*, which DC represents are temporary or contract labor providers for which there is no evidence of any similarity to DC's operations. *R. 48.*

Finally, DC asserts that Zurich cannot retroactively change its classifications and increase premium after the Policy has expired. As provided in the foregoing, the Policy expired on October 14, 2008 and Zurich's final audit assigning new classification codes to DC did not occur until after the final audit was conducted on November 19, 2008. DC contends that under the NCCI Basic Manual, insurers are limited in their ability to change classifications if the changes result in an increase in premium. The NCCI Manual states:

> During the first 120 days of coverage, a change can be made retroactively to policy inception.
>
> After 120 days, but before the final ninety days of coverage, a change can only be made pro rata as of the date the company discovers the cause for such change.
>
> In the final ninety days, a change in classification that results in a higher premium cannot be made to the policy, but only to the next renewal policy.

*R. 48-5, pp. 99-100.* In its Reply brief, Zurich submits the Supplemental Affidavit of Priz stating, "'[T]he ninety (90) rule' has no application to Zurich's audit and classification of DC for workers compensation premium purposes because DC is a 'labor contractor' as that term is understood by the NCCI. The NCCI *Basic Manual* specifically provides that there are no time restrictions applicable to labor contractors, like DC." *R. 49-4, Exh. 2.*

In summary, DC contends that there exist genuine disputes of material fact as to the following: (1) prior to entering into the Policy, DC relied on Zurich's assurances and inducements that "the classifications which would be used would be the same as those historically used for DC International," *R. 27-1, 04/14/10 Aff. Of Hebert, p.7*; (2) while

13.

Zurich argues that the NCCI rules do not define "service contractor," other than Priz's opinion, Zurich has provided no evidence that DC is a "labor contractor" under the NCCI rules; and (3) the lack of evidence that DC is a "labor contractor" negates Zurich's argument that an exception applies to the 90 day rule for retroactively reclassifying employees.

The Court agrees that the parties have each submitted different versions of the relevant facts.  A case in such a posture is not properly disposed of by summary judgment. A motion for summary judgment can only be granted if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Before a court can find that there are no genuine issues of material facts it must be satisfied that no reasonable trier of fact could have found for the non-moving party.  *Ladue v. Chevron, U.S.A., Inc.,* 920 F.2d 272  (5th Cir. 1991).  Accordingly, Zurich's Motion For Summary Judgment will be denied.

14.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DC International, Inc.                                    Civil Action No. 09–1196

versus                                                   Judge Tucker L. Melançon

Zurich-American Insurance Group              Magistrate Judge C. Michael Hill


JUDGMENT

In accordance with the Memorandum Ruling issued on this date, it is

**ORDERED** that defendant and counter-claim plaintiff Zurich-American Insurance

Company's Motion For Summary Judgment [Rec. Doc. 45] is **DENIED**.

Thus done and signed this 28th day of January, 2011 at Lafayette, Louisiana.


_____
Tucker L. Melançon
UNITED STATES DISTRICT JUDGE